## Jonathan H. Fox

### *vs.*

### Bolitha L. Wharton *et al.*

Kent, March T. 1878.

*Foreclosure of mortgage; jurisdiction of the court of chancery; foreclosure on default of payment of installment.*

1. The right to render a judicial decree of foreclosure of a mortgage is inherent in courts of chancery at common law.

2. The power of sale by execution upon judgment reqovered in *scire facias* upon a mortgage is in no proper sense a foreclosure of a mortgage, and does not furnish a full and complete remedy to the mortgagee.

3. The Colonial Act of Delaware, for the establishment of courts (1 Del. Laws, chap. 54), vested in the courts of equity established thereby jurisdiction of "all matters and causes of equity," according to the practice of the High Court of Chancery of Great Britain; and jurisdiction to foreclose mortgages was not withheld by reason of the existence of a prior Act (1 Del. Laws, chap. 46), providing for the enforcement of mortgages by execution on *scire facias.*

4. The power to foreclose a mortgage in England by bill in equity cannot be questioned, and such power is not and never was dependent upon the mortgagee's having first recovered possession of the mortgaged land by ejectment or otherwise.

5. The powers conferred upon the courts of equity by the Colonial Act for the establishment of courts (including the power to foreclose mortgages) were not abrogated by the State Constitution of 1776, but continued thereunder in the superior courts of chancery, and have been continued in the present court of chancery, under the Constitution of 1792 and the present Constitution of 1831.

6. In this State a mortgage is but a high security for the payment of a debt, and is not a conveyance of title in the land ; hence the mortgagee acquires, under the mortgage, only a chattel interest in the land, and cannot maintain ejectment for possession thereof.

7. In this State the only remedies by which a mortgagee may enforce the mortgage are by judgment upon *scire facias* in the superior court, or by a bill in the court of chancery for a foreclosure.

8. The foreclosure of a mortgage is a matter and cause of equity which the court of chancery in this State is empowered to "hear and decree."

9. When the debt secured by a mortgage is, by the terms of the instrument, secured to be paid in installments, a bill filed in the court of chancery to foreclose for the nonpayment of the first or any subsequent installment will be entertained, and a decree of foreclosure for such cause is within the equitable jurisdiction of the court.

BILL TO FORECLOSE A MORTGAGE.—On the 12th day of November, 1867, Bolitha L. Wharton and wife executed a mortgage of three several tracts, pieces, and parcels of land to secure the payment of the sum of $9,000, with lawful interest for the same, from and after the 1st day of January next after the date of said mortgage, in the manner and at the times mentioned and stipulated in a certain writing obligatory recited in said mortgage. The said sum of $9,000, with interest for the same, as aforesaid, was to be paid in the following manner :

"The whole principal debt to be clear of interest until the 1st day of January next ensuing the date hereof (1868), and from and after that time the interest on the whole principal debt, or any part thereof which may remain unpaid, to be paid to the said James C. Wallace on the 1st day of January in each and every year, and at the expiration of five years from the 1st day of January, 1868, the sum of $4,500 to be paid to the said Mary B. Wallace, her executors, administrators, or assigns. From and after the expiration of five years from the

said 1st day of January, 1868, the said interest on the residue of said principal debt, or any part of said principal debt remaining unpaid, to be paid annually on the 1st day of January in each and every year to the said James C. Wallace, when the same or any part thereof remains unpaid, and at the expiration of ten years from the said 1st day of January, 1868, the said residue or further sum of $4,500 to be paid to the said Mary B. Wallace, her executors, administrators, or assigns. Provided that in case the said James C. Wallace shall die at any time before the said principal debt becomes due and payable or is paid and satisfied, the interest which may accrue thereon after his death shall be paid to the said Mary B. Wallace, her executors, administrators, or assigns. And provided, further, that the said Bolitha Wharton may at his option at any time pay the whole or any part of said principal debt, not less than $1,000 at any one time; and the interest on such part so paid shall after such payment cease."

The complainant in this cause files his bill for a foreclosure of said mortgage.

The bill recites the provisions of the mortgage; that Mary B. Wallace was the daughter of the said James C. Wallace; that she intermarried with the complainant; that she had issue one child; that she died on the 10th day of February, 1875, leaving the said child as her only issue; and that the said child afterwards died on the 15th day of August, 1875.

The bill also states that the complainant was afterwards appointed the administrator of Mary B. Fox, and that James C. Wallace assigned to the complainant, for a valuable consideration, all his interest in said mortgage. It also states that the interest on the mortgage has been paid up to January 1, 1873, and that one installment thereof—to wit, the sum of $4,500, with the interest on the whole amount of $9,000 from said last-mentioned date—is now due and payable to complainant, Jonathan H. Fox, assignee of James C. Wallace. It also states that the mortgage was given to secure the purchase money of that portion of the lands therein mentioned which were conveyed by the said James C. Wallace and Mary B·

Wallace to the said Bolitha L. Wharton, being the tracts mentioned in said mortgage as Nos. 1 and 2. It also recites the execution and delivery by the said Wharton to the said James C. Wallace and Mary B. Wallace, on the day of the date of the mortgage, of his judgment bond for the debt mentioned in the mortgage, and that no proceedings have been instituted at law; and recites the incumbrances against the said Bolitha L. Wharton.

The bill prays as follows:

1. That an account may be taken of what is now due and payable of the principal and interest on said mortgage.

2. That the defendants, Bolitha L. Wharton and Ann Eliza Wharton, his wife, may be decreed to pay to the complainant the amount which shall be found to be now due and payable on the principal and interest on said mortgage, together with his costs of this suit, by a short day to be appointed for that purpose; or in default thereof the said defendants, Bolitha L. Wharton and Ann Eliza Wharton, his wife, and all persons claiming under them, may be absolutely foreclosed of all right and equity of redemption in or to the said mortgaged premises; or that the said last-mentioned defendants release the equity of redemption; or that the mortgaged lands and tenements, or so much thereof as may be necessary, be sold to pay what is now due and payable of the principal and interest of said mortgage.

3. That the complainant may have such further and other relief as the nature of the case may require.

The defendants have demurred to the bill of complaint, and the question is: Is the complainant entitled to the relief he prays? The defendants contend that this court has no jurisdiction in respect to the foreclosure of mortgages; that there was no law in this State to foreclose mortgages prior to the Act said to have been passed between the years 1726 and 1736 (1 Del. Laws, chap. 46, § 5, p. 109, entitled, "An Act for Taking Lands in Execution for Payment of Debts"), and that the remedy under this statute, as slightly modified by the provisions of the Revised Code of 1852, p. 404, is the

only remedy now existing available to a mortgagee against a mortgagor upon nonpayment of the debt secured to be paid by the mortgage. The second ground assumed in support of the demurrer is that a mortgage cannot, under the laws of this State, be foreclosed for the nonpayment of one or more installments of the debt secured to be paid thereby, and not until the whole debt is due and payable. And, lastly, it is contended that the court of chancery of this State has no power to decree a sale of the mortgaged premises for the payment of the mortgage debt.

*Eli Saulsbury* and *C. H. B. Day*, for the defendants, on demurrer to the bill:

This demurrer is twofold in its character. It goes to the jurisdiction as well as to the equity upon the face of the bill.

Prior to the Constitution of 1792, the powers of a court of equity in this State were exercised by the court of common pleas. 1 Del. Laws, chap. 54, p. 121 (Const. 1792, art. 6, p. 42, § 14), defines the powers of the court of equity. Const. 1831, art. 6, § 5. The general powers of a court of equity are of accident and mistake, account, fraud, specific performance of agreements, trusts, and infants. 2 Madd. p. 21.

Under the English laws the fee passed to the mortgagee subject to the equity of redemption. The mortgagee went into actual or constructive possession of the land, and took the rents and profits; and, by reason of the extreme severity of the law, equity interposed and relieved the mortgagor. The court of equity decreed a reconveyance upon payment of the money. 1 Pow. Mort. chap. 6, pp. 139, 140; 4 Kent, Com. p. 173.

Mortgages, in this State, since 1736, have been considered as only security for money. Jurisdiction is given to courts of law over mortgages by *scire facias*. 1 Del. Laws, chap. 46, p. 112, § 5.

The power to issue *scire facias* twelve months after the time at which they were due is given to the court of common pleas. Code 1829, p. 206, passed between 1726 and 1736.

The power over all causes of a civil nature was given to the superior court by the Constitution of 1831, p. 31, § 3.

In Rev. Code 1852, p. 404, power was given to issue *scire facias* at any time after maturity.

As to the powers of a court of equity, see *Ashhurst* v. *Montour Iron Co.* 35 Pa. 30 ; *Bradley* v. *Chester Valley R. Co.* 36 Pa. 141.

The law is modified from the English law. *West Branch Bank* v. *Chester*, 11 Pa. 290.

Where there is a remedy given at law insufficient, the party must show that he has exhausted his remedy at law. Mitf. Eq. 179, 180.

Equity supplies, does not subvert, the law. 1 Story, Eq. p. 13, §§ 10–12, 19, 21, 61.

The statute law is direct and governs the case. Equity is as much bound by it as a court of law, and can as little depart from it. 1 Story, Eq. pp. 71, 72, § 64 ; 4 Kent, Com. top p. 210, note.

The law in force at the time of the contract enters into and forms a part of the contract without any express stipulation in it. *Bronson* v. *Kinzie*, 42 U. S. 1 How. 311 (11 L. ed. 143) ; *Sheets* v. *Peabody*, 7 Blackf. 613.

The mortgagee must protect himself in his contract. 4 Kent, Com. 181 ; 1 Story, Eq. § 331 ; *Harshaw* v. *McKesson*, 66 N. C. 266 ; *Ashhurst* v. *Montour Iron Co.* 35 Pa. 43.

The Constitution and laws of the State, giving power over mortgages to courts of law by *scire facias*, and mortgages being only securities for money, took from courts of equity jurisdiction over mortgages. Mortgages being no longer conveyances of land in fee, the reason for interference of a court of equity being gone, the jurisdiction is also gone.

*Jacob Moore*, for the complainant :

In equity a mortgagee has no other remedy to collect his debt except by foreclosure. He cannot proceed against mortgagor's other property or *in personam ;* and he may proceed

at law on the bond at the same time he is suing in equity. *Dunkley* v. *Van Buren*, 3 Johns. Ch. 330.

He may proceed in both courts at once.   6 Johns. Ch. 77.

Bill in equity to foreclose may be sustained, as well as the statutory *scire facias*.   2 Hill. Mort. 65, § 74, note (9).

The mortgagee may pursue all his remedies or enforce all his securities concurrently or successively until the mortgage debt be paid.   2 Hill. Mort. 103, 110, § 15; 107 § 5; Id. 104, citing *Burnell* v. *Martin*, 2 Doug. (Eng.) 417; 5 Cush. 231, 232; 19 Pick. 537; 22 U. S. 9 Wheat. 489 (6 L. ed. 142); 4 Gray, 299, 432; 8 Paige, 71; 3 Johns. Ch. 330; 10 Johns. 481; 4 Kent, Com. 183; 9 Serg. & R. 314; 6 Johns. Ch. 77; *Lockhart* v. *Hardy*, 9 Beav. 349, cited in 6 Harr. Dig. 934; 1 Del. Ch. 310; Hempst. 442, cited in Bright. Fed. Dig. p. 578, § 108; 7 Paige, 437; 8 Paige, 70; 18 Ark. 546; 2 Atk. 344; 2 Md. Ch. 322.

He is entitled to his costs in both courts when he proceeds in equity and at law.   2 Hill. Mort. 103, note (2), citing 18 Ark. 546; 2 Madd. 554.

In those States which have no courts with full equity powers, the general principle applies that equity will not interfere when an action at law would accomplish the same purpose.   2 Hill. Mort. 127, 128.

In England equity does not decree a sale unless by consent of the mortgagee.   *Spragg* v. *Binkes*, 5 Ves. 590, note 5; 13 Ves. 205; 18 Ves. 83.

But when no such consent on his part is necessarily to be implied, a mortgagee can never be compelled to submit to a sale or to relinquish the estate until he has the mortgage money actually in his own hands.   *Spragg* v. *Binkes, supra*, citing 2 Swanst. 257.

A decree for sale of the estate, instead of a foreclosure, would be more analogous to the relative situation of lender and borrower.   *Perry* v. *Barker*, 13 Ves. 205; 4 Kent, Com. *181, 182; 2 Story, Eq. 1025; 18 Ves. 84; *Mondey* v. *Mondey*, 1 Ves. & B. 223, cited in 36 Pa. 147, 149, notes. 151; 9 Cow. 352; 2 Hill. Mort. 30–38.

The natural and best course is decree for sale. *Hart* v. *Ten Eyck*, 2 Johns. Ch. 101 ; 3 Pow. Mort. 963 *b*, note (1); 2 Story, Eq. 1024, 1025 ; 4 Kent, Com. 481.

In England foreclosure is the remedy. 4 Kent, Com. *181. The sale is not granted against will of mortgagor except when the mortgage is of land and by the local law is subject to a sale. 2 Story, Eq. 1026, note (8), citing *Bronson* v. *Kinzie*, 42 U. S. 1 How. 321 (11 L. ed. 147).

There is nothing strange in equity decreeing sale of land. In some cases, under old law, equity was peculiarly resorted to. 2 Story, Eq. 1216 *a.* We now have a statute giving equity right to sell lands to enforce its decrees. Code, 571.

In *Jones* v. *Conde*, 6 Johns. Ch. 77, only one year's interest was in arrear and due and unpaid when bill for foreclosure was filed.

In a suit for foreclosure, commenced when the first only of several mortgage notes had fallen due, judgment for the sale of the entire mortgaged premises is erroneous unless it appeared by the record that the court inquired whether the land could be sold in parcels, and that provision was made for the notes not due. *Cubberly* v. *Wine*, 13 Ind. 353; *Wainscott* v. *Silvers*, Id. 497.

The mortgagee may proceed in equity on failure to pay one installment after it is due. 2 Hill. Mort. 116, 117, citing *Caufman* v. *Sayre*, 2 B. Mon. 205, 206 ; 1 Johns. Ch. 617 ; 6 Johns. Ch. 77 ; 1 Broom & H. Com. 303, note (*s*), citing *Edwards* v. *Martin*, 25 L. J. Ch. D. 284; 10 Paige, 296 ; 5 Paige, 29 ; 2 Paige, 301 ; 2 Johns. Ch. 486, 487 ; 4 Johns. Ch. 534 ; *Roddy* v. *Williams*, 3 Jones & La T. 1, cited in 6 Harr. Dig. 943 ; 1 Bibb, 149 ; 3 Bland, 125, 179, 180, note (*t*), and authorities cited; 2 Bland, 461 ; 5 Gill & J. 314; 2 Md. Ch. 64, 413 ; 30 Ill. 422 ; 11 Pa. 290, 292 ; Coote, Mort. 518 ; 2 Vern. 135 ; 2 Washb. Real Prop. 226.

The mortgagee may recover at law on one installment. 3 Pars. Cont. 188, notes (*i*), (*j*) ; *Cooke* v. *Whorwood*, 2 Saund. 337 ; 1 Bibb, 149 ; 2 Str. 957.

Equity treats a mortgage only as a means of collecting a

debt, not as a means to get possession of the land by the breach of the condition.   2 Hill. Mort. 115, 116, note (*a*), cl. 3, 4, 117, citing *Oaufman* v. *Sayre*, 2 B. Mon. 205, 206.

Equity treats a mortgage as a debt or evidence of a debt same as a note.   29 Barb. 277.

The deed of mortgage creates a contract respecting a debt as well as a conveyance of the estate.   It is a collateral security only.   2 Hill. Mort. 117, citing *Penniman* v. *Hollis*, 13 Mass. 430.

By a bill in equity we may obtain a strict foreclosure whereby the mortgagee becomes absolute owner (2 Hill. Mort. 38, § 12), or a sale of the property whereby the premises are sold or proceeds applied to incumbrances as surplus to the mortgagor (Id. 30, 31; Cruise, Dig. 15, chap. 6, § 1).

Foreclosure being clearly within the jurisdiction of a court of equity, it is held that a court of equity, having obtained jurisdiction for this purpose, may give full relief and order a sale.   2 Hill. Mort. 31, citing, in note (3), 9 Cal. 123; 9 Iowa, 114, 126, 388, 218.

But if the money is not paid by the day, the condition on which the land is to revert to the mortgagor has not been complied with, and the interest of the mortgagor in the land is then reduced to a mere equity of redemption.   2 Hill. Mort. 22, note (*a*).

For distinction between legal right of redemption (a right existing before day of payment arrives), and equity of redemption (a right existing after day of payment has passed), see 1 Hill. Mort. 30, note (*a*), 153.

While the mortgagor may prevent a foreclosure or sale, in the case of a mortgage payable by installments, or when interest is due, and not the principal, by paying the sum due; yet, if he fails to do so, a sale will be decreed of so much of the property as will pay the amount due, when the decree will stand as a security for the other installments as they may become due.   Or if the property cannot be conveniently or safely sold in parcels, it may be disposed of entire, and the whole debt paid, with such rebate of interest on the sums not due as may be just and equitable.   2 Md. Ch. 67.

The power of sale is merely cumulative (1 Wis. 420; 22 Cal. 116; 8 Ala. 694; 21 Ala. 573; 15 Tex. 267; 48 Miss. 444), and does not supersede the right of foreclosure in equity (*Hall* v. *Sullivan R. Co.* 11 L. R. N. S. 138).

A statutory remedy never ousts an otherwise existing jurisdiction of the same subject at law or in equity, unless there are express words or clear implication showing a legislative intent to make the statutory proceeding exclusive. Sedg. Stat. & Const. L. 100, note (citing 7 Fla. 13; 6 Ohio N. S. 307; 12 Iowa, 58; 21 Iowa, 332); Id. 98, note (*a*) (citing 5 Clarke (Iowa) 1; 47 Mo. 146; 7 Nev. 245; 2 Abb. U. S. 305 (Rev. Laws); 52 Ill. 63; 37 Ga. 397; 44 Ill. 198; 3 Heisk. 110; 66 U. S. 1 Black, 459, 17 L. ed. 218; 78 U. S. 11 Wall. 652, 356, 20 L. ed. 235; 36 Ill. 268; 41 Mo. 16. Statutory remedy is merely cumulative. Sedg. Stat. & Const. L. 75 (citing Comyn's Dig. *Action on Statute, C ;* 2 Doug. 556; 5 Johns. 175; 5 Mass. 514; 16 Mass. 245; 3 Hill, 39; 5 Johns. 175; 13 Johns. 322; 15 Johns. 220; 18 Wend. 220).

The statute of between 1726 and 1736, old Code, 101, gives equity jurisdiction to judges of court of common pleas.

The Constitution of 1792 says (art. 6, § 1): "The judicial power of this State shall be vested in a court of chancery," etc.

Art. 6, § 14, says: "The equity jurisdiction heretofore exercised by the judges of the court of common pleas shall be separated from the common-law jurisdiction and vested in a chancellor, who shall hold courts of chancery," etc.

The Constitution of 1831 (art. 6, § 5), says: "The chancellor shall hold the court of chancery. This court shall have all the jurisdiction and powers vested by the laws of this State in the court of chancery."

The statute giving remedy by *scire facias*, passed between 1726 and 1736 ( old Code 1829, p. 205, § 5, Code 1874, p. 687), is not a sufficient remedy. The case of *Wilhelm* v. *Lee*, 2 Md. Ch. 323, shows that the remedy for collecting a mortgage debt at law is not so full, complete, remedial, and sufficient as in equity.

All lands shall be liable to be sold by order of the chan-

5 Del. Ch. 14

cellor for executing decree.    Code 1829, pp. 118, 119, passed
1811 ; Code 1874, p. 571, § 12.

THE CHANCELLOR.—The first proposition — namely, that
the court of chancery in this State has no jurisdiction what-
ever of the subject of mortgages — may seem startling to
some of the older members of the profession, the generally
received opinion being, as I had supposed, that such jurisdic-
tion exists.    It is not the dictate, however, of sound reasoning
to reject a proposition as untrue upon its first announcement,
and for the reason, solely, that it has never been heard of
before.    Such a determination would necessarily lead to the
rejection of all propositions, however correct and demon-
strable ; for all propositions have had a first announcement.
The position taken by the solicitors of the defendants was
supported by an earnestness and ingenuity, and an extent
of research into the constitutional and legislative history of
the State, that are not only commendable, but which entitle
their arguments to careful consideration and to a deliberate
judgment by this tribunal.

From the time that Delaware became an English colony,
its inhabitants became subject to law, and were entitled to
the rights, benefits, and privileges of law.    Even before
statutory law was enacted, law ruled among them, determined
their rights, their obligations, and secured to them the vindi-
cation of those rights and enforcement of those obligations
either presently or in the future.    What was this law which,
in the absence of any legislation by themselves, was to them
a protecting shield and an avenging sword ?    What was this
that measured their rights, prescribed their duties, and which
protected and enforced those rights and duties ?    It was the
common law of England, which belonged of common right
to every subject of the English government.    Chancellor
Kent has well remarked that this common law has been
assumed by the courts of justice, and declared by statutes, so
far as is applicable to their situation and government, as the
law of the land in every State of the Union.    It was imported

by our Colonial ancestors as far as it was applicable, and was sanctioned by royal charters and Colonial statutes.  It is also the established doctrine that English statutes passed before the emigration of our ancestors, and applicable to our situation, and in amendment of the law, constitute a part of the common law of this country.  Now, what is this common law in its broad, just, and most comprehensive sense?  In this sense it is not simply that portion of remedial justice which is administered in common-law tribunals; but it consists of those principles, usages, and rules of action applicable to the government and security of person and property, which do not rest for their authority upon any express and positive declaration of the will of the Legislature.  It is that law which derives its force and authority from the universal consent and immemorial practice of the people.  And this was the common law which the English colonists who settled in what is now the State of Delaware brought with them as their right, and which they were entitled to enjoy, and did enjoy, even before they had established local tribunals for its administration or enforcement.  This common law, thus defined, included those equitable principles, usages, and rules of action applicable to the government and security of person and property which do not rest for their authority upon any express declaration of the will of the Legislature, as well as those technically legal principles, usages, and rules of action of like applicability, administered in purely legal tribunals.  The rights of a free people are to be construed, not in a narrow technical sense, but in a broad and comprehensive sense; and in this sense equity is as much common law as is that law which is administered in tribunals other than those of equitable jurisdiction.  Now this common law, in the language of *Sir* Matthew Hale, is not the product of the wisdom of some one man or society of men in any one age; but the wisdom, counsel, experience, and observation of many ages of wise and observing men.  A great proportion of the rules and maxims which constitute the immense Code of the common law, in the language of Chancellor Kent,

grew into use by gradual adoption, and received, from time to time, the sanction of the courts of justice without any legislative Act or interference. It was the application of the dictates of natural justice and cultivated reason to particular cases. The common law may properly be called the *omnium gatherum* of the choice, selected principles of all Codes of law applicable to human rights and human conduct, human or divine. Even the principles applicable to the subject of mortgages were not indigenous in early English law. They were borrowed from the Roman civil law, and adopted into the English common law; and thus became of necessity a subject of cognizance under that portion of the common law distinctly denominated " equitable jurisprudence."

An examination of the legislation of this State confirms the views here presented. Our published laws date from the year 1700. They assume the existence of the common law as I have defined it, and provide for its enforcement with such additional legislation, supplementary thereto, as the supposed necessities of society required. It was held, however, at an early day, that English statutes in respect to crimes did not extend to these " plantations," except where they were particularly named in the body of such Acts; and therefore in 1719, " An Act for the Advancement of Justice, and more Certain Administration thereof " was passed, prescribing the punishment for certain crimes therein enumerated. This was the first general Act in relation to crimes, in the legislation of Delaware, of which I have any knowledge. It did not pretend to define the several crimes mentioned in it, but simply prescribed a punishment for their commission. These crimes were treated in the Act as common-law offenses. The preamble to the Act, however, as well as the omission to define the crimes mentioned in it, show that the legislators of that early day regarded the English common law as the law of the Colony. The beginning of that preamble, among other things, recites " that, whereas the common law is justly esteemed to be the birthright of English subjects, and ought to be regarded in this government as the safest rule of our conduct," etc.

At an early day, " An Act for the Establishing Courts of Law and Equity within this Government " was passed. By § 21 of this Act a court of equity was established, to be held " by the justices of the respective county courts of common pleas, four times a year, at the respective places and near the said times as the said courts of common pleas are held in every county of this government." By this Act the justices holding said court of equity were " empowered to hear and decree all such matters and causes of equity as shall come before them in the said courts, where proceedings shall be, as heretofore, by bill and answer, with such other pleadings as are necessary in chancery courts, and proper in these parts, with power, also, for the said justices of the respective courts of equity to issue forth all manner of subpœnas, and all other process as may be needful to oblige and force defendants to answer suits there, as also to award commissions for taking answers and examining witnesses, and to grant injunctions for staying suits in law, and stopping wastes, as there may be occasion; observing, as near as may be, the rules and practice of the High Court of Chancery in Great Britain, with power to make orders and award all manner of process, and do all other things necessary for bringing causes to hearing, and to enforce obedience to their decrees in equity,— which may be by imprisonment of bodies or sequestration of lands,—and admit bills of revivor, as the case may require."

It will be observed that there is no attempt in this Act to define what are " causes of equity." What those causes were, was to be determined by the justices holding the said court of equity. How were they to determine this matter? Unquestionably by the principles, rules, and practice of the High Court of Chancery in Great Britain. They were not supposed to be familiar with the jurisdiction and practice of any other court of equity; but, being British subjects, they were supposed to be familiar with the jurisdiction and practice of the High Court of Chancery of the government under which they lived, and to which special reference was made in the Act. The powers of the court of equity thus created were in no

respect limited by the Act creating it, otherwise than by pro-
viding that the justices comprising it should observe "as near
as may be" the rules and practice of the High Court of Chan-
cery in Great Britain.   It is not easy to conceive of a court
of equity possessing more undefined and unlimited powers.
Whatever power and authority the High Court of Chancery
in Great Britain possessed in respect to "causes of equity,"
and which were proper to be exercised in "these parts," was
possessed by the first court of equity in Delaware by the law
which created it.

The solicitors for the defendants seem to think that the
powers of this court were greatly limited by § 25 of this Act.
That section is as follows: "Provided, also, that nothing
herein contained shall give the said justices any power or
authority to hear, decree, or determine in any matter, cause, or
thing, wherein sufficient remedy may be had in any other court,
or before any other magistrate or judicature in this govern-
ment, either by the rules of the common law, or according to
the tenor and directions of the laws of this government; but
that when matters determinable at common law shall be brought
before them in equity, they shall refer or remit the parties to
the common law; and when matters of fact shall happen to
arise upon their examination or hearing of the matters and
causes to be heard and determined in the said court, then, and
in every such cause, they shall order the matter of fact to issue
and trial at the court of common pleas for the proper county
where the fact ariseth, before they proceed to sentence or
decree in the said court of equity."   Now this supposed limita-
tion amounts substantially to no limitation at all, for the
reason that, where there is a complete remedy at law, courts
of equity do not assume to exercise jurisdiction.   This is a
fundamental principle of equity jurisprudence, and it is this
principle which is incorporated in § 25 of the Act for the
Establishing Courts of Law and Equity within this Govern-
ment.   A cause in which there is a complete remedy at law
is not a matter and cause of equity at all.   The section cited,
therefore, is nothing but a legislative declaration of what
would have existed without it.

But the solicitors for the defendants, if I understand their argument aright, maintain that the court of chancery of this State has no jurisdiction to decree the foreclosure of a mortgage, even if such power exists elsewhere, because they say that the Colonial authority of Delaware, somewhere between the years 1726 and 1736, passed an Act entitled "An Act for Taking Lands in Execution for Payment of Debts," 1 Del. Laws, chap. 46, p. 109; and that by § 5 of said Act a mortgagee, in default of payment, may, after one year from the day of the last payment, sue forth a writ of *scire facias* on such mortgage, and take out execution on any judgment given therein, and expose the mortgaged premises to sale. It is difficult to perceive the force of this argument. What was the object of this Act? What was the evil proposed to be remedied by it? It explains itself. It declares its own purpose and object. That purpose and object it declares thus : " To the end that no creditors may be defrauded of their just debts due them from the persons who have sufficient real, if not personal, estate to satisfy the same, be it enacted . . . that all lands, tenements, or hereditaments whatsoever, within this government, where no sufficient personal estate can be found, shall be liable to be seized and sold upon judgment and execution obtained." Now the court of chancery has never assumed to make anything liable—whether land or anything else—for debt, by force of its own decree, which was not so liable by the law of the land. It would seem by the recital of the Act referred to that, prior to the passage of the Act, real estate in Delaware was not subject to be seized in execution to satisfy even a debt evidenced by judgment, and that the Act was passed to render lands subject to the payment of judgment debts, and authorized execution to be issued on such judgments, under which the lands of judgment debtors could be seized and sold. And "forasmuch," says § 5 of the Act, "as divers persons have mortgaged their lands and tenements in this government for securing the payment of moneys, and some of them have died before the time of payment, and left others to succeed that have proven insolvent, and others

have neglected to pay the mortgage money, and so mortgages are become no effectual security; considering how low the annual profits of tenements and improved lands are here, and the discouragement which the mortgagees meet with by reason of the equity of redemption remaining in the mortgagors,"— it is provided that the mortgagee, in default of payment of the debts secured to be paid by the mortgage, may after one year sue forth a writ of *scire facias* upon the mortgage in order that judgment may be recovered thereon; and that when judgment is so recovered the mortgagee—the plaintiff in such judgment—"shall have execution by *levari facias* directed to the proper officer, by virtue whereof the said mortgaged premises shall be taken in execution and exposed to sale." The object of this section was none other than to enable a mortgagee to recover judgment against the mortgagor for the debt secured to be paid by the mortgage, and, the amount of the debt due on the mortgage being thus ascertained by proceedings on *scire facias* and reduced to judgment, to place such judgment on an equal footing with other judgment debts in respect to execution process, being distinguished only in this: that the judgment recovered for the mortgage debt might be proceeded on in execution by *levari facias*, as against the specific mortgaged real estate, whereas the general judgment creditor might have execution on his judgment by a *fieri facias* against the real estate general of the debtor in his judgment.

But it is argued that, inasmuch as one of the reasons assigned in the preamble to § 5 of the Act for giving the remedy by *scire facias* to the mortgagee was "the discouragement which the mortgagees met with, by reason of the equity of redemption remaining in the mortgagors," therefore there is no power in the court of chancery in this State to foreclose the equity of redemption to which a mortgagor is entitled. It appears by the section recited that conveyances by mortgage, as a security for the payment of money, were recognized by the laws of the Colony. It also appears that the existence of the right to the equity of redemption in the

mortgagor of the premises so conveyed was, in like manner, recognized. Now the right of redemption and the right of foreclosure, as we shall hereafter see, are coexisting and mutual rights. This mutuality necessarily arises from the nature and character of a mortgage. The discouragement which mortgagees met with before the passage of the Act referred to might have arisen notwithstanding the words of the preamble to § 5 thereof, not by reason of the equity of redemption remaining in the mortgagors, but because there may not have been any tribunal established by the laws of the colony, clothed with the power of foreclosing the equity of redemption remaining in the mortgagors. The right to foreclose the mortgage did necessarily exist, if the right of redemption existed; and the right of foreclosure may have existed without the power to foreclose being available by reason of the nonexistence of a tribunal clothed with the power to decree foreclosure. I have no means of ascertaining whether such a tribunal did or did not exist in the colony prior to the passage of the Act entitled "An Act for Taking Lands in Execution for the Payment of Debts." It is true that § 21 of the Act for the establishing courts of law and equity within the then government before referred to declared that the justices of the respective county courts of common pleas who should hold the court of equity established by said Act should have power and authority to hear and decree all such matters and causes of equity as should come before them in the said courts, "where the proceedings shall be, as heretofore, by bill and answer." I have no means of determining what these proceedings were, nor the extent of authority and power of the tribunals where those proceedings were had. The Act for the establishment of courts, being numbered chapter 54 of the Public Laws, was, I presume, subsequent in date to the Act for Taking Lands in Execution for Payment of Debts, which is numbered chapter 46 of the same laws. If any court exercising equitable jurisdiction existed at the time of the passing of the latter Act, it is reasonable to presume that the jurisdiction thus exercised was of a very limited

character, and did not comprehend the power of foreclosing mortgages, nor extend to all such matters and causes of equity as are mentioned in § 21 of the former Act; and such want of jurisdiction in such tribunals, if they existed, was doubtless one cause of the creation of a court of equity "empowered and authorized to hear and decree all such matters and causes of equity" as should come before the justices of the courts of common pleas holding said court of equity. If the High Court of Chancery in Great Britain had the power to decree the foreclosure of mortgages, there can be no doubt that the court of equity created by § 21 of the Act for the Establishing Courts of Law and Equity within the Government of the then Colony possessed the same power, because such cause would be a cause of equity; nor in such case would the provision of a law prior in date, giving to a mortgagee, in default of payment after one year, the right to sue forth a writ of *scire facias* on his mortgage, to recover judgment therein, and to have execution thereof by *levari facias*, and to expose the mortgaged premises to sale, oust such court of equity of its jurisdiction, for the reason that remedy under the proceedings upon *scire facias* is not such an adequate or complete remedy as to devest the jurisdiction of such court of equity; the former remedy being available only after the expiration of a year from the last day whereon the mortgage money ought to have been paid or other condition performed, whereas the remedy in equity would have been available immediately upon the nonpayment of the mortgage debt, or other breach of the condition of the mortgage, or upon forfeiture for any cause whatever. In fact the power of sale by execution upon judgment recovered in *scire facias* upon a mortgage is in no proper sense a foreclosure of a mortgage; no such a foreclosure as exists as a right in the mortgagee in respect to mortgaged premises; no such a foreclosure as is treated of in books of authority and in judicial decisions as a judicial foreclosure of a mortgage. It is but a summary proceeding for the sale of mortgaged premises, without resort to a judicial decree of foreclosure; the right to make which

decree is inherent in a court of chancery, and results from the nature of a mortgage, two essential and necessary characteristics of which are the power to redeem, and the power, judicially, to foreclose.

It was said by the solicitors for the defendants, in their argument of this cause, that a statute providing for the sale of mortgaged premises by execution on a judgment recovered in *scire facias* on a mortgage, very similar to our own, exists in the State of Pennsylvania, and that the only remedy or means to foreclose a mortgage in that State is by proceedings had under the statute; and that therefore, inasmuch as a remedy is given by the statute, no remedy exists by bill in equity or otherwise than under the statute for the foreclosure of a mortgage; and they cite in support of their position the case of *West Branch Bank* v. *Chester*, 11 Pa. 282. This, no doubt, is very good law in the State of Pennsylvania, for it is the decision of the supreme court of that State. But it is argued that such, being the law of Pennsylvania, must be the law of this State, because the statute of Pennsylvania and the statute of Delaware for the sale of mortgaged premises on execution upon a judgment in *scire facias* for the mortgaged debt are substantially the same. The conclusion is not logical, because some of the conditions upon which the conclusion is founded in the one case do not exist in the other. No court of general equity jurisdiction exists or ever has existed in the State of Pennsylvania. Such a court does exist and has existed from an early period in our history, even of our Colonial history, in the State of Delaware; and because there is no remedy by bill in equity for the foreclosure of a mortgage in Pennsylvania, and because the only remedy there for the collection of the mortgaged debt is by proceedings at law under their statute,—which in fact is no such proceeding for the foreclosure of a mortgage as is known to courts of equity,—it does not follow that the remedy by bill for foreclosure in equity does not exist in Delaware, and may not exist elsewhere. But the authority cited is important in respect to some of the issues raised or objections made in the cause

before me.    In the case of *West Branch Bank* v. *Chester* the Supreme Court of Pennsylvania says: " In England a default in payment of half a year's interest on the appointed day is a sufficient breach of condition to enable the mortgagee to foreclose.    Coote, Mort. 518; and see *Gladwyn* v. *Hitchman*, 2 Vern. 135.    With us the remedy is so modified that we cannot foreclose for such a breach of condition, nor until a year after the whole mortgage debt becomes due; but the nonpayment of interest, where it is expressly stipulated for, is no less a breach of condition here than in England, or than the nonpayment of the installment of the principal.    In a word, the interest is part of the substance of the mortgage debt.    It belongs not to it by tacking,—it is not an incident of the debt, but *pro tanto* it is the debt itself.    The parties anticipated it at a fixed rate of increase, and it was just as sure to accrue as time was to last; and they put it into the mortgage as part and parcel of the debt which it was the office of the mortgage to secure.    There it remains, and a judgment at law for it must have the same effect as a judgment for any other part of the mortgage debt.    There is no room for a distinction between a judgment for the interest and a judgment for an installment of the principal.    Both are judgments for part of the mortgage debt.    A distinction here would be arbitrary and without a difference.    But on a judgment for an installment of the principal, a virtual foreclosure of the mortgage is effected by a sheriff's sale, as we have seen, the equity of redemption in the mortgagor is extinguished, and the legal estate still in him is transferred, and the lien of the mortgage is devested.    It follows, as a necessary conclusion, that the same consequences must attend a sheriff's sale of the mortgaged premises made upon a judgment obtained for the interest."

The powers of the court of equity, thus early in our history established or conferred by statute, continued substantially the same throughout our Colonial history, and until after our separation from Great Britain by the common declaration of the Colonies of their independence, and existence as separate and

independent States, and until the 20th day of September, 1776, when the first Constitution of the State of Delaware was adopted. Article 13 of this Constitution is as follows: "The justices of the courts of common pleas and orphans' court shall have power of holding inferior courts of chancery, as heretofore, unless the Legislature shall otherwise direct."

Articles 24 and 25 of this Constitution are as follows:

"Art. 24. All Acts of Assembly in force in this State on the 15th day of May last (and not hereby altered, or contrary to the resolutions of Congress or of the late House of Assembly of this State) shall so continue until altered or repealed by the Legislature of this State, unless where they are temporary, in which case they shall expire at the times respectively limited for their duration.

"Art. 25. The common law of England, as well as so much of the statute law as has been heretofore adopted in practice in this State, shall remain in force unless they shall be altered by the future law of the Legislature; such parts only excepted as are repugnant to the rights and privileges contained in this Constitution and the Declaration of Rights, etc., agreed to by this convention."

This Constitution did not in any respect, in my judgment, destroy or abridge the power and authority theretofore existing in the equitable tribunals of the State as conferred upon them by the Act for the Establishing Courts of Law and Equity within this Government, hereinbefore referred to, but affirmed and continued such power and authority in the inferior courts of chancery mentioned in article 13 aforesaid. The inferior courts of chancery mentioned in said article are the same courts of equity originally authorized to be held by the court of common pleas, etc., and hence the power to hold them, mentioned in said article, was the same in the justices of the courts of common pleas "as heretofore," unless the Legislature should otherwise direct. These inferior courts of chancery continued to be empowered and authorized to hear and decree all such matters and causes of equity as should come before them as fully as they were so authorized to hear

and decree by § 21 of the Act for the establishing courts of law, until the 12th day of June, 1792, when the second Constitution of this State was adopted, for the reason that the Legislature had not in the mean time otherwise directed. The fact that these courts are called inferior courts of chancery does in no respect refer to the question of extent or subject-matter of their jurisdiction. Courts are of various kinds. When considered as to their powers, they are of record and not of record. When compared to each other, they are supreme, superior, and inferior. When examined as to their original jurisdiction, they are civil or criminal. When viewed as to their territorial jurisdiction, they are central or local. When divided as to their object, they are courts of law, courts of equity, courts martial, admiralty courts, and ecclesiastical courts. They are also courts of original jurisdiction, courts of error, and courts of appeal. Bouv. L. Dict. These courts were called inferior courts of chancery for the reason that they were not administered by a chancellor of their own, but by the justices of another court,—the justices of the supreme court.

Section 1, art. 6, of this second Constitution of this State, is as follows : "The judicial power of this State shall be vested in a court of chancery, a supreme court, and courts of oyer and terminer, and general jail delivery ; in a court of common pleas, and in an orphans' court, register's court, and a quarter sessions of the peace for each county ; in justices of the peace ; and in such other courts as the Legislature—two thirds of all the members of each branch concurring—may from time to time establish."

Section 14 of the same article is as follows : " The equity jurisdiction heretofore exercised by the judges of the court of common pleas shall be separated from the common-law jurisdiction, and vested in a chancellor, who shall hold courts of chancery in the several counties of this State. In cases of equity jurisdiction where the chancellor is interested, the cognizance thereof shall belong to the court of common pleas, with an appeal to the high court of errors and appeals."

The jurisdiction vested in the court of chancery by this

Constitution was as extensive, and was in fact the same, as
that vested in the justices of the old supreme court when hold-
ing courts of equity, which extended to all matters and causes
of equity.   This jurisdiction was no longer to depend upon
the will of the Legislature.   It was fixed in the Constitution,
and could only be changed by a change of the Constitution.
It was not so changed, but continued the same until the 2d
day of December, 1831, when the present Constitution of the
State was adopted.   The present Constitution made no change
in the jurisdiction of the court of chancery.   That court has
now, under the present Constitution,—as had the justices of
the old supreme court holding courts of equity in the respective
counties of this State, under the provisions of the Act Estab-
lishing Courts of Law and Equity within the Colonial Gov-
ernment,—full power and authority " to hear and decree all
such matters and causes of equity as shall come before it."

Section 1, art. 6, of the present Constitution of the State,
is as follows : " The judicial power of this State shall be vested
in a court of errors and appeals, a superior court, a court of
chancery, an orphans' court, a court of oyer and terminer, a
court of general sessions of the peace and jail delivery, a regis-
ter's court, justices of the peace, and such other courts as the
General Assembly, with the concurrence of two thirds of
all the members of both Houses, shall from time to time
establish."

Section 5 of said article declares: " The chancellor shall
hold the court of chancery.   This court shall have all the
jurisdiction and powers vested by the laws of this State in the
court of chancery."

We have already seen what powers were vested by the
laws of this State in the court of chancery at the time of the
adoption of the present Constitution.   These powers the court
of chancery now possesses.   By Rev. Code of this State, chap.
95, § 1, it is declared, in words almost a literal transcript from
the Act establishing courts of law and equity during the
period of our Colonial history hereinbefore so often referred
to, that " the court of chancery shall have full power to hear

and decree all matters and causes in equity, and the proceedings shall be, as heretofore, by bill, answer, and other proper pleadings ; and the chancellor shall have power to issue subpœnas and all other process to compel defendants to answer suits there, to award commissions for taking answers and examining witnesses, to grant injunctions for staying suits at law, and to prevent wastes, as there may be occasion, according to the course of chancery practice in England, with power to make orders and award, and do all things necessary to bring causes to hearing, and to enforce obedience to decrees in equity by imprisonment of the body or sequestration of lands ; provided that the chancellor shall not have power to determine any matter wherein sufficient remedy may be had by common law or statute, before any other court or jurisdiction of this State; but that where matters determinable at common law shall be brought before him in equity, he shall remit the parties to the common law ; and when matters of fact, proper to be tried by a jury, in any cause depending in chancery, the chancellor shall order such facts to trial by issues at the bar of the superior court." This provision of the statute does not attempt in any respect to abridge the jurisdiction conferred by the Constitution upon this court. It would not be competent for the Legislature to do so, either directly or by conferring upon any other court any portion of that jurisdiction, or to make cognizable in any other tribunal any matter or cause of equity of which this court has original jurisdiction under the Constitution of the State. The law upon this subject is very well expressed by *Chancellor* Walworth in the case of *Sailly* v. *Elmore*, 2 Paige, 499. The chancellor said : "But as this court had originally the exclusive jurisdiction in such cases, it is no objection to a bill filed here, at this time, that the complainant has an adequate remedy or good defense at law." In the language of *Lord* Eldon : " This court will not allow itself to be ousted of any part of its original jurisdiction because a court of law happens to fall in love with the same or a similar jurisdiction." *Eyre* v. *Everett*, 2 Russ. 382. If a suit at law is commenced in such a case, and the defendant in that suit

unnecessarily files a bill here to set up a defense of which he may now avail himself at law, this court may refuse to interfere by way of preliminary injunction, or it may not give him costs on a final decree. But if he establishes his equitable defense here, this court cannot dismiss the bill for want of jurisdiction."

Having thus traced the history of the origin and extent of equity jurisprudence in this State, and of the tribunals by which it has been administered from the time of their creation until the present; and having shown that throughout their whole existence they have been authorized and empowered to ·hear and decree all "matters and causes of equity," it remains to consider whether a foreclosure of a mortgage by judicial decree is a matter or cause of equity. What is a mortgage? It is the conveyance of an estate by way of pledge for the security of a debt, and to become void on payment of it. At law the legal ownership was considered vested in the creditor, but in equity the mortgagor remains the actual owner until he is debarred by his own default or by judicial decree. "There is no branch of the law of real property," remarks *Chancellor* Kent, "which embraces a greater variety of important interests, or which is of more practical application. The different, and even conflicting, views which were taken of the subject by the courts of law and equity have given an abstruse and shifting character to the doctrine of mortgages. But the liberal minds and enlarged policy of such judges as Hardwicke and Mansfield gave expansion to principles, tested their soundness, dispersed anomalies, and assimilated the law of the different tribunals on this as well as on the other heads of jurisprudence. The law of mortgage, under the process of forensic reasoning, has now become firmly established on the most rational foundations."

Originally the mortgagee was entitled to the delivery of the possession of the mortgaged premises, the legal estate being vested in him subject to be defeated upon performance of the condition. He might at any time when he pleased,

and before a default, put the mortgagor out of possession by ejectment or other proper suit. The rigor and technicalities which characterized the original common-law doctrine have been greatly abated and dispensed with even in courts of law.. They have, by a gradual and almost insensible progress,. adopted many of the equitable views of courts of equity, which are founded in justice and accord with the true intent. and inherent nature of every such transaction ; and this is. particularly the case with the courts of law of this State. The equity doctrine is that the mortgage is a mere security for the. debt, and only a chattel interest, and that, until a decree of foreclosure, the mortgagor continues the real owner of the fee. The equity of redemption is considered to be the real and beneficial estate, tantamount to the fee at law ; and it is. accordingly held to be descendible, devisable by will, alienable by deed, precisely as if it were an absolute estate of inheritance at law. The influence of these principles has reached the courts of law, and Chancellor Kent, in warm admiration, observes : " The case of mortgages is one of the most splendid instances in the history of our jurisprudence, of the triumph of equitable principles over technical rules, and of the homage which those principles have received by their adoption in the courts of law. Without any prophetic anticipation, we may well say that returning justice lifts aloft her scale." Lect. 58.

These remarks are peculiarly applicable to the doctrine of mortgages as held both by the courts of law and equity in this State. The late High Court of Errors and Appeals, at. the June Term, 1818, in the case of *Robinson* v. *Harriss*, cited in 3 Harrington, 283, said : " Mortgages are, more especially in this State, to be considered merely in the light of securities for the payment of money ; the mortgagee is rarely, if ever, put in possession of the land ;" and the superior court of this State, in the case of *Cooch* v. *Gerry*, 3 Harrington,. 280, remarked that the mortgage is regarded, both at law and in equity, as a mere security for the debt. In the case of *Hall* v. *Tunnell*, 1 Houston, 326, it was decided that " a mortgage, as between the mortgagor and. the mortgagee, so long

Opinion: enforcement of mortgages.

as the former continues in possession of the mortgaged prem-
ises, is merely a security for the payment of money, and
does not absolutely convey the legal title to the premises; but
it is a lien on the property of so high a nature that it is not
devested by a sale on judgments subsequently obtained against
the mortgagor; yet if the mortgagee is in possession under
the mortgage, and the condition of it be broken, it is no
longer in the power of the mortgagor, or of anyone claiming
his title by virtue of a sale on such a judgment, to recover the
possession in ejectment. His only right in such case, as we
have before said, is to redeem the premises by paying the
mortgage." I submit, therefore, that it logically follows
from the principles applicable to mortgages in this State, as
held by the legal tribunals of the State, or as deducible from
the reasoning of those tribunals, that a mortgagee in this
State can only acquire the possession of lands mortgaged, by
the voluntary act of the mortgagor admitting him to the pos-
session, or by becoming the purchaser of the same at a sale
on execution issued upon a judgment recovered in *scire facias*
on the mortgage, or under a judicial decree of the court of
chancery declaring a foreclosure of the mortgage. He can-
not in this State, consistently with the doctrine here held in
respect to mortgages, maintain an action of ejectment against
the mortgagor in possession, even after condition broken, to
obtain possession of the mortgaged premises, for the reason
that the only interest he acquires under his mortgage is
a chattel interest; the mortgage being but a high grade of
security for the payment of a debt, and not being a convey-
ance of title in the land. He has but two remedies to pursue.
He may obtain judgment upon *scire facias* in the superior
court upon his mortgage, at any time after the last day where-
on the mortgage money ought to be paid or other conditions
performed, or he may file a bill in chancery for a foreclosure
of the mortgage at any time after condition broken; for not-
withstanding the earnestness, ability, and no doubt sincerity,
with which the opposite view was pressed in argument, I have
no doubt that the foreclosure of a mortgage by judicial

decree is a " matter and cause of equity " which the court of chancery in this State is " empowered and authorized to hear and decree."

Although it was usual in England for the mortgagee to enter into possession upon the delivery of the mortgage, and although he might recover possession, even as against the mortgagor, as well before as after condition broken, he might pursue all his remedies at one and the same time. He might bring an action on the covenant to repay the money, serve an ejectment on the tenant in possession, and file a bill to foreclose the equity of redemption ; but he could not have his money and the estate too. In England " a mortgagee may bring an ejectment at law at the same time that he hath a bill of foreclosure depending; for he will not be prevented from pursuing all his remedies for the recovery of his debts." 3 Powell, Mort. 966; Coote, Mort. 518; *Booth* v. *Booth*, 2 Atk. 343. In the latter case *Lord Chancellor* Hardwicke said : " Though the defendant is foreclosing the equity of redemption here, yet he is not precluded from bringing an ejectment at law at the same time, unless there is something very particular to take it out of the common case." Many cases might be cited to the same effect, but it is unnecessary to do so. Now the office of an action of ejectment is to recover the possession of lands. The plaintiff in ejectment brings the action, when out of possession, to recover possession when wrongfully withheld. The position, therefore, taken by the solicitors for the defendants,— that the Court of Chancery in England had not the power to foreclose a mortgage when the mortgagee was out of possession ; and that the mortgagee, if out of possession, could not file his bill to foreclose the equity of redemption until he had obtained possession of the lands by an action of ejectment,—is manifestly erroneous.

The next question to be considered is, When does the right of foreclosure of a mortgage occur, and for what may it be enforced in equity ? It occurs upon breach of condition, whether such breach be the nonpayment of money or the nonperformance of any other act, the payment of which or the

performance of which is stipulated for or secured by the mortgage at the time mentioned in respect thereto in the mortgage. It is objected, however, in this case, that a foreclosure of a mortgage cannot be decreed for the default in payment of the first installment due thereon. The condition of the mortgage is that the interest shall be paid annually, and that the sum of $4,500 was to be paid at the expiration of five years from the 1st day of January, 1868; and at the expiration of ten years from the said 1st day of January, 1868, the said residue or further sum of $4,500 was to be paid.

We have already seen what the Supreme Court of Pennsylvania said on this subject in the case of *West Branch Bank* v. *Chester.* It says: "In England a default in payment of half a year's interest on the appointed day is sufficient breach of condition to enable the mortgagee to foreclose." In the case of *Morgenstern* v. *Klees*, 30 Ill. 422, it was decided that the interest falling due yearly on a note secured by a mortgage is an installment of the debt, and the mortgage may be foreclosed to enforce its payment. It is not necessary to wait until the maturity of the note. In the case of *Brinckerhoff* v. *Thallhimer*, 2 Johns. Ch. 486, a bill was filed to foreclose a mortgage executed by the defendant on the 24th of March, 1813, on a lot or parcel of land to secure the payment of $3,000 in seven years from the 1st of April, 1813, with interest annually. The master reported $752.16 due for interest. The bill was taken *pro confesso.* A decree was made for the sale of the mortgaged premises, or so much thereof as should be necessary to raise the interest due and cost, and which could be sold separately without material injury to the parties or either of them. A default in payment of half a year's interest on the appointed day will be a sufficient breach of condition to enable the mortgagee to foreclose. Coote, Mort. 518.

The power to foreclose a mortgage by bill in equity in England cannot be questioned, and is only questioned in this cause so far as the right to foreclose there is claimed before

recovery of possession of the lands by the mortgagee in an action of ejectment or otherwise. This position, we have seen, is unsupported by authority. I have already asserted the power of this court to foreclose a mortgage for the nonpayment of the money or debt secured by it to be paid. I now decide that where the debt thus secured to be paid is by the stipulation of the mortgage secured to be paid in installments, a bill filed in this court to foreclose for the nonpayment of the first or any subsequent installment will be entertained, and that a decree of foreclosure for such cause is within the equitable jurisdiction, power, and authority of this court. The only authority referred to in the argument to show that a mortgage could not be foreclosed in equity for the nonpayment of one installment was a case to be found in the reports of the State of North Carolina. The reason assigned for the decision was that a foreclosure for such cause would be a violation of the contract between the parties to the mortgage. If the reason assigned fails, then the decision falls. That the reason must fail in this case is manifest from a consideration of the condition contained in the mortgage. That condition is as follows: " Provided always, nevertheless, —and it is hereby agreed to be a condition to these presents,— that if the said Bolitha L. Wharton, his heirs, executors, or administrators, shall and do well and truly pay or cause to be paid unto the said James C. Wallace and Mary B. Wallace, their executors, administrators, or assigns, the aforesaid debt or sum of $9,000, in the days and times hereinbefore mentioned and appointed for payment thereof, with lawful interest for the same, according to the condition of said in-part-recited obligation, without any fraud or further delay, then and from thenceforth, as well this present indenture and the estate hereby granted as the said in-part-recited obligation shall cease, determine, and become absolutely null and void to all intents and purposes, anything hereinbefore contained to the contrary in any wise notwithstanding, otherwise shall remain and continue in full force and virtue." Now the condition was broken by the nonpayment of the first installment at the

time stipulated therefor; and by the contract of the parties a forfeiture then occurred which subjected the mortgage to foreclosure in equity.

The case of *Adams* v. *Essex*, 1 Bibb, 149, decided, not under any statute, but upon consideration of the general principles applicable to the subject, places the right of a court of equity to foreclose a mortgage for the nonpayment of one installment, upon grounds, in my judgment, perfectly satisfactory. The court says: "In the former decree pronounced in this cause, we went upon the principle that when a contract is made for the payment of a sum of money by installments, no action is maintainable at law for the recovery thereof, until the last installment becomes due. Upon more mature reflection and a further examination of the authorities we are now convinced that this principle is not correct as a general rule; and that in the books it is confined to the action of debt. It seems to have grown out of the rigid principles governing that particular form of action. But in assumpsit, in covenant, and special agreements, although the plaintiff must set out in his declaration the contract as made, he may assign breaches according to the truth of the case, and shall recover damages for so much of the contract as, at the commencement of the action, was broken, without depriving him of his remedy for other breaches of the contract when they happen; or, in other words, he can from time to time recover so much as is due. The case before the court, being a suit in equity for the foreclosure of a mortgage, ought rather to be assimilated to and governed by the liberal principles which govern in covenant, assumpsit, and special agreements, than those technical and rigid rules which are applicable to the action of debt only. We are therefore of opinion that the suit was properly commenced, although but one of the installments was due at the filing of the bill. And we are the more strongly confirmed in this opinion because the chancellor, from the liberality of those principles and rules which govern courts of equity, has it in his power so to mould and fashion his decree, either as to a part or the whole of the demands,

as to do complete justice to the parties, and has power to retain the cause for the purpose of making, from time to time, such orders and decrees as justice may demand. This course of proceeding appears to be indispensably necessary in the case of mortgages to secure the payment of annuities, jointures, money acquired to be annually raised for the maintenance and education of children, and many other cases of a similar kind, in which, if it were required by law that no proceeding should be had upon the mortgage to foreclose or enforce payment until the last installment became due, the very object of the contract would be defeated, and those for whose benefit the mortgage was effected, in the mean time, might starve. The answer is not satisfactory, that the mortgagee might bring his ejectment to be let into possession, and thus compel the mortgagor to come into equity to redeem; because the estate might be unproductive, even if the mortgagee were let into possession, and the mortgagor might not come for a redemption. From these considerations it now seems to us that the suit was not prematurely instituted, and that the court of chancery had jurisdiction thereof, although only the first installment was due at the commencement of the suit; and that the chancellor, having once jurisdiction of the cause, ought not to turn the parties around at the hearing to begin *de novo*, but should go on to finish the controversy."

The ancient practice in proceedings for foreclosure, says Chancellor Kent (Lect. 58), was by bill in chancery to procure a decree for a strict foreclosure of the right to redeem, by which means the lands became the absolute property of the mortgagee. This is the English practice to this day, though sometimes the mortgagee will pray for and obtain a decree for a sale of the mortgaged premises, under the direction of an officer of the court; and the proceeds of the sale will in that case be applied towards the discharge of incumbrances, according to priority. The latter practice is evidently the most beneficial to the mortgagor, as well as the most reasonable and accurate disposition of the pledge. The practice in proceedings of foreclosure is not uniform in this country. We have

had but little practice in this State upon this subject. A bill for foreclosure of a mortgage was, however, filed to the September Term, 1849, of the Court of Chancery in and for New Castle County, by Joseph R. Townsend, executor of the last will and testament of William Townsend, deceased, against Robert Wood *et al.* The mortgage was given on the 24th day of March, 1847, to secure the sum of $4,600, being the amount of the purchase money of the lands therein mentioned, with interest at the times therein stated; to wit, upon the payment of the sum of $600, with interest thereon from the date of the mortgage, on or before the 25th day of March, 1848; and the further sum of $2,000, with interest as aforesaid, on or before the 25th day of March, 1850; and the further sum of $2,000 on the 25th day of March, 1853. A decree *pro confesso* was made in the cause on the 8th day of September, 1851; and on the 19th day of February, 1852, Chancellor Johns made a decree, which, after other recitals, was as follows: "It appearing that the said sum of $600, with interest thereon from the 24th day of March, 1847, was due and unpaid before the filing of the said bill of complaint, whereby the said condition of the said mortgage became forfeited; and that the further sum of $2,000, with interest from the same day and year, became due and remained unpaid since the filing of the said bill of complaint,—which said two sums of $600 and $2,000, with interest thereon from the said 24th day of March, in the year aforesaid, to the date of this decree, amounting in the aggregate to the sum of $3,364.84, which now remains due and unpaid by the said mortgagors,—it is therefore ordered, adjudged, and decreed that the said mortgagors do pay to the said complainant the sum of $3,364.84 on or before the 25th day of March next, and the sum of $96.74, the cost of the complainant in this cause; and in default of payment it is further ordered, adjudged, and decreed that the said mortgaged premises be sold by the sheriff of New Castle County for the payment thereof, and that the sheriff make return of such sale to this court."

I think it safe and proper to recognize the decree so made,

as authority for a similar decree in this cause, unless further proceedings shall intervene. I therefore overrule the demurrer filed in this cause.

If I have extended this opinion beyond what may seem a reasonable limit, I have been induced to do so by a desire fully to consider the questions raised by counsel in the argument. It is not my desire to assume for this court any jurisdiction which, in my judgment, does not properly and constitutionally belong to it. That jurisdiction has for the first time in the history of this State been called in question, and with a degree of zeal, earnestness, ability, and, I doubt not, sincerity, by counsel, which do them credit and entitle their arguments to full and mature consideration. I may be indulged, however, in the remark that it was here, in the State of Delaware, that the Genius of Equity at a very early day, if not for the first time, erected on this continent that magnificent temple of Equity Jurisprudence so eloquently described by Story in the conclusion of his learned Commentaries. That Genius bids her ministerial servants to guard well the approaches to her temple, and to ward off all those who would seek to despoil her of her trophies or to bear away her treasures. To all such she commands her servants to say : *Procul, procul este, profani !*

Demurrer overruled.